UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
Cally Morgan Vogelsang,                          :
                                                 :
                 Plaintiff,                      :
                                                 :
         -against-                               :
                                                 :
Commissioner of Social Security,                 :
                                                 :
                 Defendant.                      :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/22/2023

**OPINION AND ORDER**
21-CV-9338 (KHP)

**KATHARINE H. PARKER, United States Magistrate Judge**.

Plaintiff Cally Vogelsang, represented by counsel, commenced this action against

Defendant, Commissioner of the Social Security Administration ("SSA"), pursuant to the Social

Security Act ("Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of Defendant's decision that she

was not disabled as of August 13, 1999 for purposes of obtaining Child's Insurance Benefits

("CIB") and Supplemental Security Income benefits ("SSI"), and accordingly was not eligible for

benefits.  Plaintiff and Defendant both moved for judgment on the pleadings.  (ECF No. 19

("Joint Stipulation").)  For the reasons set forth below, the Court GRANTS Plaintiff's motion, and

DENIES Defendant's motion.

## BACKGROUND

Plaintiff was born on August 13, 1999.  She has pervasive developmental disorder

("PDD"), autism spectrum disorder ("ASD"), selective mutism, social anxiety, general anxiety,

and hearing loss.  (Administrative Record ("A.R.") at 112-13, 128.)  Plaintiff suffers from

chromosome microarray abnormality/deletion, which is a chromosomal disorder associated

with intellectual disability and absent or severely delayed speech, among other symptoms.  (*Id.*

at 1311, *see also* Joint Stipulation at 15.)  Plaintiff attended Port Jervis City School from Kindergarten through the twelfth grade, and she received special education support throughout her schooling.  (A.R. at 53, 417.)  After graduating high school in 2018, Plaintiff attempted to attend college at the State University of New York at Cobleskill where she was given a private dorm room and received special services and modifications, but she found the experience overwhelming and dropped out after a month.  (*Id.* at 961, 965, 1315.)  Plaintiff has an interest in working with animals but has no work experience.  (*Id.* at 1315.)

Plaintiff applied for CIB benefits on July 13, 2018 and for SSI benefits on October 30, 2018.  (*Id.* at 128, 132.)  Her applications were denied on November 20, 2018, and at the hearing level by Administrative Law Judge ("ALJ") Michael J. Stacchini on January 23, 2020.  (*Id.* at 128, 132-44).  On July 31, 2020, the Appeals Council vacated and remanded the ALJ's decision because the ALJ had failed to mark or enter into the record relevant evidence.  (*Id.* at 149-52.)  Following a supplemental hearing held on November 10, 2020, the ALJ issued another decision finding that Plaintiff was not disabled for the purpose of receiving benefits.  On September 7, 2021, the Appeals Council declined a request for review, making the November 10, 2020 decision the final Agency decision. (*Id*. at 1-3.)  Plaintiff then filed this action.

1. **Relevant Medical History**

   a. **School and State Disability Records**

When Plaintiff began Kindergarten, she was classified as Speech and Language Impaired and was diagnosed with PDD and ASD.  (*Id.*)  From first until fourth grade, Plaintiff received special education support, occupational therapy, speech therapy, and counseling services.  (*Id.*) From fifth through eighth grade, Plaintiff received program modification, speech therapy,

testing accommodation, and counseling under a Section 504 Plan.[1]  (*Id.*)  During this period,

Plaintiff was diagnosed with anxiety disorder and selective mutism.  (*Id.* at 417.)  In February

2012, a Medicaid Service Coordination Supervisor examined Plaintiff to determine her eligibility

for state Intermediate Care Facilities services.  (*Id.* at 325-26.)  The supervisor found that

Plaintiff was deficient in the areas of self-care skills, self-help skills, ability to communicate, and

self-direction; that she was completely dependent on others for management of her personal

affairs; and that she required assistance to communicate and perform self-care tasks.  (*Id.*)  On

January 10, 2013, the school district speech pathologist conducted an audiogram and found

that Plaintiff suffered from mild conductive hearing loss in the left ear.  (*Id.* at 417.)

From ninth through twelfth grade, Plaintiff received integrated special education

support for certain classes.  In April 2017, a school psychologist report indicated diagnoses of

ASD, anxiety disorder with selective mutism, and PDD.  (*Id.* at 417.)  The report noted that

Plaintiff tended to avoid eye contact, maintained a downward eye gaze, could not speak clearly,

appeared withdrawn, hid behind her hair, and did not engage in conversation.  (*Id.* at 419.)  In

approximately September 2017, an Individualized Education Program ("IEP") was implemented

to provide Plaintiff with special education services.[2]  (*Id.*)  The IEP report noted that Plaintiff

---

[1]  "Section 504 Plan" refers to Section 504 of the Rehabilitation Act of 1973, which requires public schools to offer accommodations for eligible students with disabilities.  To qualify, students must demonstrate an impairment that substantially limits at least one major life activity.  Applications are reviewed by a team of professionals who consider information including test scores, observations, and medical records.  *See* N.Y.C. DEPT. OF ED., *504 Accommodations: Student & Family Guide*, https://www.schools.nyc.gov/docs/default-source/default-document-library/504-accommodations-student-and-family-guide#:~:text=A%20504%20Plan%20is%20for,%2Dprocess%2Fthe%2Diep (last visited Feb. 22, 2023).

[2]  IEPs are developed for students who fit within specific disability classifications defined in the Individuals with Disabilities Education Act and state law and who require specialized instruction or services to meet their instructional goals. Eligibility for an IEP is assessed annually.  *See* N.Y.C. DEPT. OF ED., *The IEP*, https://www.schools.nyc.gov/learning/special-education/the-iep-process/the-iep (last visited Feb. 22, 2023).

demonstrated significant articulation errors while speaking and had difficulty speaking in a large

group or in close proximity to others.  (*Id*. at 318.)  The IEP noted that Plaintiff had the cognitive

skills necessary for school success but needed teacher support and guidance to relate

appropriately with peers and adults, as well as individual psychological counseling.  (*Id.* at 319-

21.)  A December 14, 2017 school psychologist report states Plaintiff was "in the process of

trying to function more independently," and that Plaintiff "shows a level of cognitive ability at

least roughly compatible with the study of the field of wildlife management, the area she

wishes to pursue."  (*Id*. at 427-29.)  The psychologist remarked that Plaintiff scored in the "low

average range" on a full-scale IQ test.  (*Id.* at 428.)  During her time at school, Plaintiff

consistently scored in the low average range on the Woodcock Jonson Test of Cognitive

Abilities.  (*Id.* at 317-18, 418, 420-21.)

  **b.  Treating Providers**

   **i.  <u>Primary Care Physician Patricia Lynch, D.O.</u>**

  Since Plaintiff was four years old, she has been treated by primary care physician

Patricia Lynch, D.O., ("Dr. Lynch") at Crystal Run Healthcare.  (*Id.* at 1005.)  Dr. Lynch's

treatment notes reflect ongoing diagnoses of ASD (at times documented as Asperger's

Syndrome, which was previously considered an independent diagnosis but is now considered

part of ASD), selective mutism, PDD, generalized anxiety disorder, and oppositional-defiant

disorder.  (*Id.* at 579, 588, 780, 1006.)  Treatment records from July 23, 2018 note that Plaintiff

did not speak unless asked to speak.  (*Id.* at 580-81.)

  In 2018, Dr. Lynch referred Plaintiff for a speech assessment at Orange Regional Medical

Center, and the assessment revealed moderate masked facial expression, poor speech

intelligibility, and delayed auditory processing time.  (*Id.* at 940-41.)  Plaintiff demonstrated

multiple articulatory errors that made her moderately difficult to understand.  (*Id*. at 941.)

On February 22, 2019, Dr. Lynch conducted a physical assessment of Plaintiff for

determination of Plaintiff's employability.  She opined that Plaintiff is capable of performing

part-time work activities for four hours per day, five days per week.  Dr. Lynch noted that

Plaintiff "has a very hard time functioning independently or in crowds," prefers to work with

animals rather than people, and should not work with more than one or two adults.  (*Id.*

at 1052.)  Dr. Lynch also noted that Plaintiff was under treatment for a left knee injury and she

"prefers to not stand for long periods due to the pain."  (*Id.*)

On April 1, 2019, Dr. Lynch stated that Plaintiff is limited by her social anxiety and

selective mutism, and she opined that Plaintiff is unable to work.  (*Id.* at 982.)  On November

19, 2019, Dr. Lynch authored a letter stating that Plaintiff "does not function well in the general

public and in independent situations," and that Plaintiff "needs help with daily living."  (*Id.*

at 1006.)  On February 24, 2020, Dr. Lynch authored another letter recounting Plaintiff's

diagnoses and noting that Plaintiff "struggles significantly socially."  (*Id.* at 1310.)  Dr. Lynch

opined that Plaintiff "can function with simple directions," but cannot function

"independently."  (*Id.*)  Dr. Lynch opined that Plaintiff is not able to get full time employment,

and "even working part time will be a problem because of her anxiety and mutism."  (*Id.*)  She

noted that years of counselling and medication have failed to improve Plaintiff's outcome.  (*Id.*)

### ii.  **Psychiatrist Dr. Kamthan and Therapists Salopek, Dratte, and Henry**

Since at least 2015, Plaintiff received individual and family therapy from Access:

Supports for Living, an agency that serves individuals with disabilities.  Plaintiff attended

psychotherapy and received medication management from psychiatrist Mridula Kamthan, M.D. ("Dr. Kamthan").  She attended regular therapy sessions with clinical social workers Michelle Salopek, LMSW ("Salopek") and Erica Dratte, LMSW ("Dratte") in 2015, and with Laura Henry, LCSW ("Henry") from 2016 until 2020.

Therapy treatment notes from January through December 2015 indicate that Plaintiff was presenting as anxious and guarded in therapy sessions and was struggling with anxiety.  (*Id*. at 844, 856-57, 862, 866-67.)  On January 6, 2015, Salopek noted that Plaintiff was doing well in her English class but failed gym due to lack of participation as a result of her social anxiety.  (*Id.* at 844.)  On September 12, 2015, Dr. Kamthan noted that she would continue Plaintiff on Zoloft and risperidone, and that Plaintiff needed to learn coping skills and improve her self-esteem.  (*Id.* at 862.)  Dr. Kamthan also noted that Plaintiff would often forget to attend her speech therapy sessions at school.  (*Id*.)  At a November 2015 therapy session, Plaintiff reported that she was doing well in a program for animal care and that she was able to make eye contact with the staff and ask questions appropriately.  (*Id*. at 866-67.)  At a January 2016 session, Plaintiff reported that she never talked in class, that she talked only to her friends in school, and that other students had asked her friends if she was able to talk.  (*Id*. at 870.)

In March 2016, Henry noted that Plaintiff needed coaxing to engage in sessions.  (*Id*. at 874.)  Henry's treatment notes from 2016 and 2017 reflect Plaintiff's ongoing struggles with anxiety, an inability to communicate on her own behalf, a need for continued support to express her feelings, and a lack of coping skills.  (*Id*. at 809-10, 813, 817, 890-91.)  In March 2017, Henry noted that Plaintiff may benefit from independent living skills training.  (*Id.* at 892.)  Plaintiff reported that she was doing well academically and behaviorally and denied feeling sad

or depressed.  (*Id.*)  In May 2017, Plaintiff reported that she was "talking more with teachers" and could "ask for help when needed."  (*Id.* at 897.)  At future sessions, Plaintiff continued to report that she was making efforts to become more independent.  (*Id*. at 899, 904.)  However, on February 22, 2018, Henry noted that Plaintiff was "still reluctant to do certain things independently," such as scheduling her own appointments.  (*Id.* at 917-18.)  Plaintiff also generally reported that she was "not very concerned" about adjusting to college, despite concerns from her mother and others that she may struggle away from home.  (*Id.* at 899, 904.)

Following a therapy session on May 23, 2017, Dr. Kamthan opined that Plaintiff needs a "consistent" and "structured" environment.  (*Id.* at 896.)  On July 21, 2017, Dr. Kamthan noted that Plaintiff's mother reported that Plaintiff "made excellent grades."  (*Id.* at 900.)  In December 2017, Dr. Kamthan noted that Plaintiff's grades were fluctuating but Plaintiff was "interacting more with other people and not show[ing] anxiety."  (*Id*. at 887.)  Dr. Kamthan continued Plaintiff on Zoloft but discontinued Risperidone because Plaintiff wanted to cut down her medications.  (*Id.* at 892-93.)  On February 15, 2018, Plaintiff and her mother attended a therapy session with Dr. Kamthan, who noted that Plaintiff was not taking her Zoloft and was doing well without it.  (*Id.* at 916.)  She noted that Plaintiff needs to continue regular therapy to learn coping skills.  (*Id.*)

Therapy notes from this time period also reflect that Plaintiff was experiencing conflict with her older sister, Michele, and that the two sometimes became "physically aggressive."  (*Id.* at 907, 910, 912, 913, 915.)  Plaintiff's mother expressed concerns regarding how Plaintiff was speaking to Michele, and Plaintiff appeared to accept that she needed to be kinder to her sister. (*Id.* at 907.)

In the months leading up to Plaintiff's college start date, Henry worked with Plaintiff to develop her ability to function independently.  (*Id*. at 918, 921, 925.)  On May 4, 2018, Henry expressed that Plaintiff was making progress in verbalizing her thoughts and feelings.  (*Id.* at 922.)  Plaintiff reported that she attended a class trip to Disney World and had liked her roommates.  (*Id*. at 923.)  On August 8, 2018, Dr. Kamthan noted that Plaintiff was looking forward to going to college but would need to continue regular therapy.  (*Id.* at 929.)  Therapy notes from October 2018 indicate that Plaintiff found college "overwhelming" and returned home.  (*Id*. at 961, 965.)  Notes from subsequent therapy sessions indicate Plaintiff's stated goal was "to get a job and a place of my own someday."  (*Id.* at 1337, 1340.)  These notes also indicate that Plaintiff was receiving treatment from a new psychiatrist who suspected that Plaintiff has mild bipolar disorder.  (*Id.* at 1344.)

### iii.    Treating Geneticist Maryam Banikazemi, M.D.

In April 2017, Plaintiff was referred to the geneticist Maryam Banikazemi, M.D. ("Dr. Banikazemi") at Boston Children's Health Physicians for an evaluation of her developmental and speech delays. (*Id*. at 557.)  Dr. Banikazemi conducted genetic testing and found results indicative of microdeletion syndrome, which is a chromosome disorder associated with growth restriction, muscular hypotonia, psychomotor retardation, intellectual disability, absent or severely delayed speech, and distinct facial expressions.  (*Id*. at 565.)  Dr. Banikazemi clinically assessed Plaintiff with psychosocial disorder and PDD, and at a follow-up visit, also assessed Plaintiff with intellectual disability, speech delay, and behavior disturbance.  (*Id*. at 561, 984-87.)  Dr. Banikazemi noted that Plaintiff's chromosome disorder may be the cause of her functional delays.  (*Id*. at 987.)

On February 10, 2020, Dr. Banikazemi authored a letter opining that due to Plaintiff's intellectual disability, she will always require supervision and cannot live independently. (*Id*. at 1311.) On June 29, 2020, Dr. Banikazemi indicated ongoing diagnoses of behavior disturbance, chromosomal abnormality, intellectual disability, and speech delay. (*Id*. at 1325.) Dr. Banikazemi assessed Plaintiff's developmental and speech delays as steady, with no regression, and she noted continuing signs and symptoms of behavioral impairment, including social withdrawal, embarrassment, social anxiety, and selective mutism. (*Id*.)

### iv.  Ear, Nose, and Throat Specialist Katrina R. Stidham, M.D.

In approximately 2014, Plaintiff began to regularly visit Katrina R. Stidham, M.D. ("Dr. Stidham"), an ear nose and throat specialist, for recurring ear infections. Dr. Stidham's treatment notes indicate ongoing complaints of anxiety and chronicle that Plaintiff "is not good at self-reporting if there is an issue." (*Id*. at 459, 464-65, 474, 479, 482, 489, 494). Dr. Stidham diagnosed Plaintiff with conductive hearing loss of the left ear and diffuse otisis externa (i.e. external ear canal inflammation). (*Id*. at 459.)

### c.  Evaluating Psychologists and Psychiatrists

### i.  Examining Psychologist Vega Lalire, Ph.D.

On August 16, 23, and 30, 2018, licensed psychologist Vega Lalire, Ph.D. ("Dr. Lalire"), evaluated Plaintiff as part of a reassessment for ASD. (*Id*. at 1046-51.) Dr. Lalire assessed Plaintiff using numerous measures including semi-structured interviews and behavioral observations. In a report issued following the assessment, Dr. Lalire confirmed that Plaintiff is properly diagnosed with ASD. She noted that during the evaluation sessions, Plaintiff maintained a rigid, neutral expression, never smiled, rarely offered or asked for information,

used no descriptive or emotional gestures, maintained poor eye contact, lacked social

communication, answered questions flatly, revealed no interest in what was said to her, and

lacked the ability to identify feelings in others.  (*Id*. at 1047.)  Dr. Lalire also noted that Plaintiff

did not take medication without prompting, plan her clothing for the weather, exercise, label

her feelings in words unless prompted, accept helpful suggestions, control her feelings when

given constructive criticism, or apologize when she hurt someone's feelings.  (*Id*. at 1048-49.)

Dr. Lalire opined that the demands of college away from home are beyond Plaintiff's

ability to cope, and while Plaintiff may be expected to make progress towards "at least semi-

independence," she needs to enhance her work skills in a part-time work setting with

supervision.  (*Id.* at 1049.)  Dr. Lalire opined that Plaintiff would need to rely on Social Security

funds while she enhances her work skills in a more supportive setting.  (*Id*.)

### ii.   Examining Psychologist Kelli Meland-Lewis, Ph.D.,

On March 14, 2020, Plaintiff presented to Kelli Meland-Lewis, Ph.D., ("Dr. Meland-

Lewis") for an evaluation of her adaptive functioning.  (*Id.* at 1328.)  Dr. Meland-Lewis

conducted a range of tests on Plaintiff.  Plaintiff reported to Dr. Meland-Lewis that she

struggled to speak to others unless spoken to and struggled to use the telephone.  (*Id*.)  Dr.

Meland-Lewis noted that Plaintiff had not been able to cope with college and dropped out after

a month.  (*Id*.)  She also noted that Plaintiff does not nod or smile when talking; has great

difficulty using the telephone; displays poor eye contact; lacks facial expression; cannot

respond appropriately in social settings; and cannot maintain tasks without support from

others.  (*Id*. at 1330-31.)  Dr. Meland-Lewis's assessments revealed that Plaintiff was in the

twelfth percentile of general adaptive composite ability.  (*Id.* at 1329.)  Dr. Meland-Lewis was

optimistic that Plaintiff could work (though would be better suited to working with animals rather than people) but noted that Plaintiff lacked appropriate work-related skills and needed to work with a job coach to develop these skills in a safe environment.  (*Id*.)

### iii.    Examining Psychiatrist Quazi Al-Tariq, M.D.

On July 23, 2020, Plaintiff presented for an independent psychological evaluation with board certified psychologist Quazi Al-Tariq, M.D. ("Dr. Al-Tariq").  (*Id*. at 1333.)  On mental status examination, Plaintiff appeared disheveled with disfluent speech, happy mood, labile affect, and sluggish psychomotor activity.  (*Id*. at 1334.)  Dr. Al-Tariq opined that Plaintiff is "permanently mentally disabled and unable to work," and that she "will always require assistance and medication."  (*Id*. at 1334.)  Dr. Al-Tariq also diagnosed Plaintiff with bipolar disorder, depressed type.  (*Id.*)

### iv.    SSA Consultative Examiner Alison Murphy, Ph.D.

On October 9, 2018, Plaintiff presented for a psychiatric evaluation with SSA consultative examiner Alison Murphy, Ph.D. ("Dr. Murphy").  (*Id*. at 930-40.)  Plaintiff reported symptoms of irritability, social withdrawal, fear of being judged in social settings, and avoidance of social settings.  (*Id*. at 930.)  Dr. Murphy noted that Plaintiff reported she could dress, bathe, groom, cook, clean, and do laundry independently, and that she had five friends, but she needed help managing her money, did not drive, and did not take public transportation.  (*Id*. at 932.)  Dr. Murphy observed that Plaintiff did not offer spontaneous verbalizations, offered minimal responses, and would typically shake her head from side to side or look to her mother for answers.  (*Id*. at 931.)

Dr. Murphy assessed that Plaintiff had a fair manner of relating, social skills, and overall presentation; was appropriately groomed; had normal motor behavior and posture; had appropriate eye contact; and had a flat affect.  (*Id*.)  She assessed that Plaintiff's receptive language was below adequate and her general fund of information was somewhat limited but found Plaintiff had coherent and goal directed thought processes, intact memory skills, average intellectual functioning, and fair insight and judgment.  (*Id*. at 931-32.)  Dr. Murphy diagnosed Plaintiff with learning disorder, anxiety disorder, Asperger's syndrome, persistent depressive disorder, oppositional defiant disorder, and social anxiety disorder.  (*Id*. at 933.)

Dr. Murphy opined that Plaintiff had moderate limitations in her ability to understand, remember, and apply complex directions; interact adequately with supervisors, coworkers, and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; and regulate emotions, control behavior, and maintain well-being.  (*Id*. at 932-33.)  She opined that Plaintiff had mild-to-moderate limitations in understanding, remembering, and applying information; interacting with others; and sustaining concentration, persistence, and pace; mild limitations in her ability to understand, remember, and apply simple directions; and no limitation in her ability to use reason and judgment to make work-related decisions; to be aware of normal hazards; or to maintain personal hygiene and appropriate attire.  (*Id* at 932-33.)  She further opined Plaintiff's psychiatric and cognitive problems "may significantly interfere with [Plaintiff's] ability to function on a daily basis" and that Plaintiff would require assistance to manage her own funds.  (*Id*. at 933.)

**v.     SSA Psychological Consultant J. Dambrocia, Ph.D.**

On November 19, 2018, non-examining state agency medical psychological consultant J. Dambrocia, Ph.D. ("Dr. Dambrocia") reviewed Plaintiff's medical record and found Plaintiff is able to understand and remember simple and complex instructions and procedures; maintain adequate attention and complete ordinary work tasks on an ongoing basis; and independently sustain a routine over time.  (*Id*. at 125.)  He opined that Plaintiff has difficulty with socialization but can engage in routine interactions to meet basic work needs and that Plaintiff can adapt to changes in a routine work setting and make work-related decisions, but that she should be limited to a low-stress work environment and should have limited contact with the public and superficial contact with coworkers and supervisors.  (*Id*.)

**2.   Hearings before the ALJ**

A hearing was held on December 5, 2019, at which Plaintiff testified that she has three friends, but she does not go out to the movies or the mall.  (*Id.* at 54.)  Plaintiff further testified that she spends most of her day in her room by herself, and she comes out of her room for lunch and sometimes for dinner.  (*Id*. at 62.)  She stated that she has a hard time talking to people, but she finds it easier to communicate in smaller groups.  (*Id.* at 60.)  She testified that she tried to attend college away from home but returned after a month because she could not handle the environment.  (*Id*. at 56-57.)  She stated that she would like to try to go back to college someday, but she is "just not prepared for it" at this time.  (*Id*. at 67.)  Plaintiff did not think she could work around other people. (*Id*. at 65.)

Plaintiff's mother, Evette Vogelsang, also testified at the hearing.  She stated that Plaintiff gets "very anxious and upset in large crowds."  (*Id*. at 69.)  She also confirmed that

Plaintiff spends most of her time in her room and only leaves her room in short intervals.  (*Id.* at 70.)  Plaintiff's mother also testified that Plaintiff does not always answer questions that are directed to her and often requires someone to speak for her.  (*Id*.)  She stated that Plaintiff does not use the phone or make her own appointments.  (*Id*. at 70-71.)

The vocational expert ("VE"), Brian Lock, also testified at the hearing.  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience with no exertional limitations but who is limited to simple, routine and repetitive tasks with only a brief superficial interaction with the general public, only occasional interaction with coworkers and supervisors, and no tandem tasks.  (*Id.* at 75-76.)  The ALJ asked the VE whether jobs would exist for such a person in the economy.  (*Id.*)  The VE testified that an individual with those restrictions would not be able to work if they could not work in tandem with someone else.  (*Id.* at 76.)  The ALJ clarified that this person could work in the same room as someone else but would be restricted to working on a task by themselves, such as "[c]leaning jobs" where the person is cleaning by herself although others may be cleaning in the building.  (*Id.*)  The VE testified that under this set of facts, this person could work, for example, as a label cutter, marker, and packager, but the individual would not be able to work in isolation.  (*Id.* at 77.)  The VE also testified that if the individual needed to be off-task 20 percent of the workday, they could not work.  (*Id.*)

On January 23, 2020, the ALJ issued a decision finding Plaintiff was not disabled within the meaning of the Act and was not entitled to CIB or SSI  (*Id.* at 128, 132-44).  On July 31, 2020, the Appeals Council vacated the decision and remanded the case to the ALJ.  (*Id.* at 149-52.)  Following the remand, a subsequent hearing was held on November 10, 2020.  (*Id.* at 86).  At

this hearing, Plaintiff testified that she still has only three friends and that her mother continues to make her appointments and arrange transportation for her. (*Id*. at 94-95.)  Plaintiff testified that she still does not feel ready to look for work or to be around people in a work situation. (*Id*. at 98, 101-02.)  She also testified that she continues to see a psychiatrist and therapist for her mental health issues, and she continues to take prescribed medication, but she has not seen an improvement in her symptoms.  (*Id*. at 99-100.)

The VE Barry Hensley testified at this hearing.  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age and education who is limited to simple, routine, and repetitive tasks with regularly scheduled breaks provided at two-hour intervals, with few changes in the work setting, and limited to brief and superficial interaction with the general public and occasional interaction with coworkers and supervisors but without tandem tasks. The VE testified that such an individual could work as a hand-packer, laundry sorter, or domestic laundry worker.  (*Id*. at 105.)  However, the VE testified, such a person could not work if they needed to be off-task for 20 percent of the workday or if they would require two or more unscheduled absences per month.  (*Id*. at 105.)  Similarly, such a person could not work if they required more than occasional interaction with supervisors.  (*Id.* at 105, 109.)

### 3.  The ALJ's Decision

On January 25, 2021, the ALJ issued a decision finding Plaintiff was not disabled within the meaning of the Act and was not entitled to CIB or SSI.  (*Id*. at 7-27.)  As an initial matter, the ALJ noted that the alleged onset date of Plaintiff's disability occurred prior to Plaintiff reaching 22 years of age, and accordingly Plaintiff could be considered for CIB.   The decision then followed the established five-step sequential evaluation process for determining whether an

individual is disabled.  *See* 20 C.F.R. §§ 404.1520(a), 416.920.  At step one, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (*Id*. at 12.)

At step two, he found Plaintiff suffers from the severe impairments of ASD, anxiety disorder,

selective mutism, PDD, speech delay, intellectual disorder, oppositional defiant disorder, and

hearing loss.  (*Id*. at 13.)

      At step three, the ALJ determined that Plaintiff's impairments did not meet or medically

equal the severity of a listed impairment in 20 C.F.R. § 404, Subpart P, App'x 1.  (*Id*.)  In making

this finding, the ALJ first considered whether the paragraph B criteria are satisfied.  To satisfy

the paragraph B criteria, the impairments must result in one "extreme" limitation or two

"marked" limitations in any of the following four broad areas of functioning: (1) ability to

understand, remember, or apply information; (2) ability to interact with others; (3) ability to

concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself.  *See* 20 C.F.R.

§ 404.1520a.

      The ALJ determined that Plaintiff has only a "mild" limitation in the area of

understanding, remembering, or applying information, because treatment notes showed

Plaintiff's memory was "normal" and testing revealed her IQ and perceptual reasoning were in

the low to average range.  (*Id.* at 14.)  The ALJ also determined that Plaintiff has a "mild"

limitation in the area of concentrating, persisting, or maintaining pace, because while

consultative and mental status exams found Plaintiff to be moderately impaired in this area,

Plaintiff is nonetheless "able to complete tasks, maintain a regular work schedule, follow

instructions, and focus generally."  (*Id.*)

The ALJ determined that Plaintiff had "moderate" limitations in the remaining broad functional areas. As to interacting with others, he acknowledged that Plaintiff "had selective mutism, did not like to be around large crowds, had difficulty talking to other people, and relied on her mother to speak on her behalf," but found that "[d]espite that," she "had a good rapport with providers, was pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments," and has "good relationships with friends and family." (*Id.*) As for adapting or managing oneself, the ALJ acknowledged that Plaintiff has anxious moods and does not dress appropriately for the weather, but nonetheless found that she had "appropriate grooming and hygiene, gets along well with providers and staff, and had no problems with temper control" and she is able to perform some chores independently. (*Id.*)

The ALJ next determined that the evidence failed to establish the presence of the "paragraph C" criteria because there was "no evidence" that Plaintiff required a highly structured setting that was ongoing and diminished the symptoms of her mental disorder or that she had a minimal capacity to adapt to changes in her environment or new demands.

The ALJ then turned to assessing Plaintiff's residual functional capacity ("RFC").[3] The ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: she is limited to performing only "simple routine repetitive tasks," can handle "decision making and changes in [the] work setting related to simple routine tasks;" needs "regularly scheduled breaks at 2 hour intervals;" can have "only brief and superficial interaction with the general public and occasional interaction with []

---

[3] The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

coworkers and supervisors," cannot perform "tandem tasks," and is "limited to a moderate sound/noise level." (*Id.* at 16, *see also* Joint Stipulation at 30.)[4]  In making this finding, the ALJ reviewed the treatment records, medical opinion evidence, and other evidence including Plaintiff's testimony.

In considering the treatment records, the ALJ noted Plaintiff's diagnoses of ASD, PDD, selective mutism, and hearing loss, and he noted that numerous records discuss Plaintiff's difficulties socializing and that she often appeared reserved and withdrawn.  (*Id.* at 17.)  The ALJ also highlighted recent therapy records showing some improvement, including that Plaintiff became more comfortable with her therapist, was able to attend a class trip to Disney World, and was interested in working part time.  (*Id.* at 18.)  The ALJ noted that Plaintiff stated she is able to cook and clean independently; that her full-scale I.Q. is in the low average range; and that the evidence does not show side effects from medication.  (*Id.*)

As for the opinion evidence, the ALJ found persuasive the opinions of SSA consultants Dr. Dambrocia and Dr. Murphy that Plaintiff had mild limitations in understanding, remembering, and applying information, and moderate limitations in interacting with others, adapting or managing oneself, understanding and remembering complex instructions and procedures, maintaining concentration and pace, and independently sustaining a routine over time.  (*Id.* at 20-21.)  The ALJ also found persuasive Dr. Murphy's opinions that Plaintiff had no limitations in using reason and judgment to make work-related decisions, maintaining personal hygiene and appropriate attire, and having awareness of normal hazards, and that Plaintiff's

---

[4]  The Court notes that the RFC is confusingly worded in the ALJ's decision, and this interpretation of the RFC accords with Defendant's contentions in the Joint Stipulation.

psychiatric and cognitive problems "may significantly interfere with [her] ability to function on a daily basis." (*Id.* at 21.)  The ALJ also found that the evidence supports a limitation on Plaintiff's ability to hear. (*Id.* at 19.)

As to examining psychologist Dr. Lalire, the ALJ found persuasive her opinion that Plaintiff has relative strengths in reasoning and efficient sustained attention to repetitive material. (*Id.* at 20.)  The ALJ disregarded as "conclusory" and going to an issue reserved to the Commissioner Dr. Lalire's opinion that Plaintiff needs to enhance work skills in a part-time job with supervision; Dr. Lynch's opinion that Plaintiff "is unable to work;" and Dr. Al-Tariq's opinion that Plaintiff is "permanently mentally incapacitated and unable to work." (*Id.* at 20-21.)  Similarly, the ALJ disregarded treating geneticist Dr. Banikazemi's opinion that Plaintiff requires supervision because he found this opinion did not address Plaintiff's work-related limitations.  The ALJ also disregarded the opinion of Dr. Meland-Lewis that Plaintiff needs to develop job skills "in a safe environment with the support of a job coach or mentor," because he found this was not consistent with Plaintiff's activities of daily living. (*Id.* at 21.)  The ALJ did not discuss Dr. Lynch's opinions that Plaintiff does not function well in the general public and in independent situations and that she needs help with daily living.

At step four, the ALJ found that Plaintiff has no past relevant work. (*Id.*)  At step five, relying on the VE, he found Plaintiff can perform work as a hand packer, laundry sorter, and laundry worker. (*Id.* at 22.)  Thus, the ALJ determined that Plaintiff has not been disabled from August 13, 1999, through the date of the decision. (*Id.* at 23.)  On September 7, 2021, the Appeals Council declined a request for review, making the ALJ's decision the final Agency decision. (*Id.* at 1-3.)

**LEGAL STANDARDS**

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing under the Secretary's regulations and fully and completely developed the administrative record.  *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (citation omitted).  The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination."  *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003).  Once the court is satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the court then assesses the Commissioner's conclusions.  In doing so, the court is limited to determining whether the Commissioner's conclusions (1) "were supported by substantial evidence in the record," and (2) "were based on a correct legal standard."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citation omitted).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C. §§ 423(d)(5)(B).  The decision must set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  *Id*. § 405(b)(1).  It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence."  *Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *5 (S.D.N.Y. Oct. 21, 2021) (citation omitted).

That said, the ALJ need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  If the ALJ fails to consider evidence in the record, the Court must be "able to look to other portions of the ALJ's decision and to clearly credible evidence" to find that the determination was supported by substantial evidence.  *Mongeur*, 722 F.2d at 1040 (citation omitted).  If the Commissioner's findings are supported by substantial evidence, those findings are conclusive.  42 U.S.C. § 405(g); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As to the correct legal standard, the Commissioner is required to conduct a sequential five-step inquiry to determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) if not, whether she has a "severe impairment" that limits her ability to do basic work activities; (3) if so, whether the impairment is listed in Appendix 1 of the regulations, and what the claimant's RFC is; (4) if the impairment does not qualify as a listed impairment, whether the claimant possesses the RFC to perform her past work; and (5) if the claimant is not capable of performing past work, whether she is capable of performing other work that exists in the national economy.  *Vellone v. Saul*, 2021 WL 319354, at *5 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Vellone on behalf of Vellone v. Saul*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).  The claimant bears the burden of proof at the first four steps of the analysis, and at the last step, the Commissioner has the burden to show there is work the claimant can perform.  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

The Commissioner must also appropriately weigh the medical opinions.  "A medical opinion is a statement from a medical source about what you can still do despite your

impairment(s) and whether you have one or more impairment-related limitations or restrictions." 20 C.F.R. § 404.1513(a)(2)).  When considering the medical opinions, the Commissioner must consider five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).  The supportability and consistency factors are the "most important," and ALJs must explain how they considered those factors for medical opinions.  *Id*. §§ 416.920a, 416.920c(b)(2).  The supportability inquiry focuses on how well a medical source supported and explained their opinion.  *Vellone,* 2021 WL 319354, at *6.  The question of consistency concerns whether the opinion is consistent with other evidence in the medical record.  *Id.*  "[T]he ultimate conclusion of whether an individual is 'disabled' or 'unable to work' is reserved to the Commissioner and conclusory opinions by others are entitled to no particular weight."  *Nunez v. Astrue*, 2013 WL 3753421, at *11 (S.D.N.Y. July 17, 2013) (citations omitted).

Regarding claims filed on or after March 27, 2017, in evaluating the medical evidence, the Commissioner need not assign particular evidentiary weight to treating physicians as was previously required by the Act.  *Vellone*, 2021 WL 319354, at *6.  However, the regulations continue to recognize the "foundational nature" of the observations of treating sources.  *Steven M.W. v. Comm'r of Soc. Sec.*, 2022 WL 2669491, at *6 (S.D.N.Y. June 17, 2022), *report and recommendation adopted sub nom.*, *Washburn v. Comm'r of Soc. Sec.*, 2022 WL 2669296 (S.D.N.Y. July 11, 2022).

## DISCUSSION

As an initial matter, the Court finds that the ALJ provided Plaintiff with a full and fair hearing under the Secretary's regulations and completely developed the administrative record.

Accordingly, the Court turns to the question of whether the ALJ's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.

1.   **The ALJ Erred in Evaluating Whether Plaintiff's Impairments Medically Equaled a Listed Impairment**

In assessing whether Plaintiff satisfies the Paragraph B criteria, the ALJ determined that Plaintiff has only a "mild" limitation in the area of concentrating, persisting, or maintaining pace, and moderate limitations in the broad functional areas of "interacting with others" and "adapting and managing oneself."  In assessing whether the paragraph C criteria are met, the ALJ found "no evidence" of a minimal capacity to adapt to changes in the environment or new demands.  These findings are not supported by substantial evidence.

a.   **Concentrating, Persisting, and Maintaining Pace**

The broad functional area of concentrating, persisting, and maintaining pace refers to the abilities to focus attention on work activities and to stay on-task at a sustained rate.  20 C.F.R. § 404, Subpart P, App'x 1, § 12.00(E).  This includes, for example, the ability to complete tasks in a timely manner, avoid distractions while working, change activities or work settings without being disruptive, and sustain regular attendance at work.  *Id.*

The ALJ determined that Plaintiff has a mild limitation in this area.  He acknowledged that the SSA psychiatric consultative examiners Dr. Murphy and Dr. Dambrocia found that Plaintiff was in fact moderately impaired in this area, but nonetheless found that Plaintiff "is able to complete tasks, maintain a regular work schedule, follow instructions, and focus generally." (A.R. at 14.)  It is not clear how the ALJ reached these findings since Plaintiff has never worked, and while she completed high school, she required significant accommodations and support to do so.  The ALJ does not cite anything in the record to support his findings as to

Plaintiff's abilities in this area and the Court is not aware of any evidence in the record supporting an ability to maintain a regular work schedule.  Moreover, the treatment records demonstrate that Plaintiff in fact struggled to maintain tasks or follow instructions without assistance and support from her mother and others.  (*See, e.g. id*. at 58, 809-10, 813, 1330.) The ALJ also did not explain how Plaintiff's purported abilities to complete tasks, maintain a schedule, follow instructions, and focus generally are sufficient to contradict the opinions of two SSA consultants that Plaintiff has greater than mild limitations in this area.  As such, the Court cannot determine that this finding was based on substantial evidence.

Moreover, the ALJ's opinion is internally inconsistent, since he later found "persuasive" the two SSA consultants' opinions that contradict a finding of a mild limitation in this area.  (*Id*. at 20.)  This is an especially troubling error as it suggests a lack of the appropriate level of care expected from an ALJ, and warrants remand.  *Lee v. Astrue*, 2011 WL 1675101, at *7-8 (W.D.N.Y. May 4, 2011) (finding error meriting remand where the ALJ's decision was internally inconsistent).

### b.  Interacting With Others

The broad functional area of interacting with others refers to the abilities to relate to and work with supervisors, co-workers, and the public, such as by cooperating with others, asking for help when needed, handling conflicts, stating your point of view, initiating or sustaining conversation, and understanding and responding to social cues.  20 C.F.R. § 404, Subpart P, App'x 1, § 12.00(E)(4).  In finding that Plaintiff had a moderate limitation in this area, the ALJ recognized that Plaintiff suffers from selective mutism, cannot handle crowds, struggles to speak to others, and relies on her mother to speak on her behalf, but nonetheless cited

Plaintiff's "good rapport" and "comfort" with providers, her "cooperative" and "pleasant" nature, her "good" interactions with non-medical staff, and her "good" relationships with friends and family. (A.R. at 14.)  The ALJ does not cite to the record to support these findings, and this Court is not able to determine from the decision or from its own review of the record the basis for the ALJ's findings.

To the contrary, Plaintiff's providers consistently described her as not speaking unless spoken to, hiding behind her hair, needing coaxing to engage in discussion, having a "masked" facial expression, remaining "rigid" during evaluations, answering questions "flatly," not making eye contact, lacking social communication, experiencing "significant" social struggles, having articulation errors, and lacking the ability to communicate on her own behalf. (*Id.* at 580-81, 809-10, 813, 817, 890-91940-41, 1047, 1310, 1330-31.)  Plaintiff's providers also observed that Plaintiff "is not good at self-reporting if there is an issue," nor is she able to identify feelings in others, accept helpful suggestions, control her feelings when given constructive criticism, or apologize when she hurt someone's feelings. (*Id*. at 464-465, 474, 479, 482, 489, 4941047-49.)  Moreover, treatment notes reflect that Plaintiff had serious relational and communication issues with her sister Michele, including becoming physically aggressive with Michele; that she only has three friends; that she did not speak to anyone at school beside her friends; and that she had numerous panic attacks while at college due to being overwhelmed socially. (*Id.* at 907, 910, 912, 913, 915.)  The ALJ's findings of good rapport, cooperative and pleasant nature, and good interactions and relationships do not comport with the record.

Plaintiff did appear to somewhat come out of her shell during therapy sessions with Henry – a trained therapist – after years of regular therapy, and she self-reported to doing well

during a class trip to Disney World, which was likely supervised by teachers and staff.  It is not

logical to assume Plaintiff's apparent minor progress in these two instances would translate to a

workplace setting or otherwise negate a finding of marked to extreme limitations in this area.

*See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (finding the ALJ erred in

assuming plaintiff's ability to engage in certain activities during the day meant plaintiff was able

to work for sustained periods).

Since the ALJ has not provided an explanation for how he interpreted the record to show

only a moderate limitation in the area of interacting with others, the Court cannot conclude that

he relied on substantial evidence in reaching this determination.  *See Adams ex rel. Williams*

*v. Barnhart*, 2003 WL 102824, at *12-13 (S.D.N.Y. Jan. 10, 2003) (finding the ALJ did not rely on

substantial evidence in determining plaintiff had "moderate" rather than "marked" limitations

in interacting with others because he overlooked evidence showing that plaintiff fights with her

peers and exhibits "odd" and "inappropriate" behavior); *Christopher B. v. Comm'r of Soc. Sec.*,

2023 WL 110117, at *8 (W.D.N.Y. Jan. 5, 2023) (finding the ALJ impermissibly cherry-picked by

highlighting records that reflect stable findings without reconciling records that reflect plaintiff's

anxiety, panic attacks, and difficulty interacting with others).

### c.  Adapting and Managing Oneself

The broad functional area of adapting and managing oneself refers to the abilities to

regulate emotions, control behavior, and maintain well-being in a work setting.  20 C.F.R. § 404,

Subpart P, App'x 1, § 12.00(E)(4).  In determining that Plaintiff had only a moderate limitation in

this area, the ALJ acknowledged that Plaintiff has anxious moods and does not dress

appropriately for the weather but found that she had "appropriate grooming and hygiene, gets

along well with providers and staff," "had no problems with temper control" and is able to

perform some household chores independently.  (A.R. at 14.)  The ALJ did not cite to the record

to support these findings, and it is not clear on what evidence he relied in making them.

On the Court's review of the record, there appears to be ample evidence supporting a

finding that Plaintiff is more than moderately limited in adapting and managing herself.   For

example, treatment notes and testimony reflect that she is dependent on her mother to book

appointments for her, communicate for her, make phone calls on her behalf, and prepare her

meals.  (*See id.* at 95, 809-13, 817, 890-91.)  Plaintiff also was unable to cope with living away

from home in a supportive college environment.  (*Id*. at 579.)  Moreover, numerous medical

experts opined in some form that Plaintiff lacks the ability to manage independently and

requires supervision.  For example, Dr. Lynch noted that Plaintiff "has a very hard time

functioning independently," and that she "needs help with daily living."  (*Id.* at 1006, 1052.)  Dr.

Banikazemi opined that Plaintiff cannot live alone and "will always require supervision."  (*Id*. at

1311.)  Dr. Al-Tariq opined that Plaintiff is unable to maintain her activities of daily living

independently and will always require assistance.  (*Id*. at 1334.)  Dr. Lalire opined that Plaintiff

may have the capacity to progress toward "at least semi-independence," but she is not there

yet.  (*Id.* at 1049.)  Dr. Meland-Lewis opined that Plaintiff cannot maintain tasks without support

from others and recommended that Plaintiff work with a job coach or trainer.  (*Id*. at 1331.)

The ALJ did not appear to consider these opinions in finding that Plaintiff had only

moderate limitations in this functional area, and thus did not rely on substantial evidence in

reaching his determination.  *See Gorton v. Comm'r of Soc. Sec.*, 2019 WL 6768780, at *4-5

(W.D.N.Y. Dec. 12, 2019) (finding the ALJ erred in failing to consider the opinion of a consultative

examiner that plaintiff is moderately to markedly limited in performing complex tasks independently and requires supervision, and that this evidence was relevant to whether plaintiff's impairment medically equaled a listed impairment).

If, on remand, it is found that Plaintiff has marked limitations in any two of these broad functional areas or an extreme limitation in any one area, then Plaintiff's impairments must be found to medically equal a listed impairment and Plaintiff will be entitled to benefits. Accordingly, the ALJ's errors in evaluating the Paragraph B criteria were not harmless.  *See id.*

### d.  Adapting to Changes and New Demands

To satisfy the paragraph C criteria, a plaintiff must demonstrate marginal adjustment, that is, a "minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life."  C.F.R. § 404 Subpart P, App'x 1, § 12.00 (G)(2)(C).  Marginal adjustment is achieved where changes or increased demands have led to exacerbation of symptoms and signs, and to deterioration in functioning.  *Gabriel C. v. Comm'r of Soc. Sec.*, 2019 WL 4466983, at *8 (N.D.N.Y. Sept. 18, 2019).

The ALJ concluded that there was "no evidence" of marginal adjustment.  However, the record does contain *some* evidence that Plaintiff cannot adapt to changes in her environment or increased demands.  In particular, the evidence is clear that Plaintiff was not able to cope with the increased demands of college and dropped out after only a month.  While the ALJ might reasonably conclude that this is not sufficient evidence for a finding of marginal adjustment, he should, at the very least, say so.  It is unclear from the decision whether the ALJ even considered Plaintiff's failure to adapt to college in considering the paragraph C criteria.  In fact, the ALJ's decision does not discuss Plaintiff's struggles to adapt to college, but rather simply

states that she "left college after a month," without noting that this was due to panic attacks and feeling overwhelmed by the experience.  Accordingly, the Court cannot determine that the ALJ relied on substantial evidence in finding that the paragraph C criteria were not met.

### 2. The ALJ Erred in Failing to Discuss the Supportability or Consistency Factors Regarding Four Medical Opinions that Plaintiff Requires Supervision.

The ALJ summarily rejected the opinions of four medical experts (Drs. Banikazemi, Lalire, Meland-Lewis, and Al-Tariq) reflecting that Plaintiff cannot function independently and requires supervision in the workplace.  In doing so, the ALJ failed to meaningfully discuss the supportability or consistency factors, amounting to legal error.

To start, geneticist Dr. Banikazemi authored a letter on February 10, 2020 opining that based on her observations while treating Plaintiff, it is her opinion that Plaintiff "will always require supervision" and will not be able to live on her own.  The ALJ did not discuss the supportability or consistency of this opinion, but rather stated the opinion "does not address the claimant's ability to do work-related activities or describe particular limitations in the ability to do work-related activities."  (A.R. at 21.)  Accordingly, the ALJ apparently determined that this opinion was not a "medical opinion" and did not need to be considered.  However, the opinion is a statement from a medical source about Plaintiff's "impairment-related limitations or restrictions," and thus is a medical opinion for purposes of the Act.  20 C.F.R. § 404.1513(a)(2) (defining "medical opinion").  The doctor was not required to specify that the limitation in question applies to the workplace, and to the extent it was unclear to the ALJ whether the opinion applied to a workplace setting, the ALJ should have sought clarification from Dr. Banikazemi.  *Hinterberger v. Comm'r of Soc. Sec.*, 2020 WL 4434920, at *4 (W.D.N.Y. Aug. 3, 2020) (finding the ALJ "should have recontacted the sources" rather than discounting the

opinions as vague); 20 C.F.R. § 404.1519p(b) ("[i]f the report is inadequate or incomplete, we will contact the medical source who performed the consultative  . . . and ask that the medical source furnish the missing information.").  Thus, the ALJ erred in rejecting this opinion without discussing its supportability or consistency.

Second, after observing and evaluating Plaintiff, Dr. Lalire opined that while Plaintiff may have the potential to progress toward "at least semi-independence," she currently "must rely upon Social Security funds while she enhances work skills in a part-time job with supervision." (A.R. at 1049.)  Without discussing the supportability or consistency of this opinion, the ALJ determined it was "not persuasive" because it is "conclusory and addresses issues reserved to the Commissioner." (*Id.* at 21.)  It is correct that a portion of Dr. Lalire's opinion addressed an issue reserved to the Commissioner; that is, whether Plaintiff must rely on Social Security.  The ALJ appropriately gave this portion of the opinion little weight.  *Nunez*, 2013 WL 3753421, at *11.  However, there was more to Dr. Lalire' opinion than that: the doctor also opined that Plaintiff is limited in her ability to function independently and she requires supervision.  The ALJ was not permitted to disregard this portion of the opinion without discussing its supportability and consistency.  *Holmes v. Saul*, 2020 WL 3270535, at *8 (E.D.N.Y. June 17, 2020) (explaining that the ALJ was not required to consider physician's opinion that plaintiff was totally disabled but was required to consider the substance of the physician's findings).  The ALJ's failure to consider Dr. Lalire's opinion that Plaintiff requires supervision amounted to legal error.

Similarly, examining psychiatrist Dr. Al-Tariq concluded that Plaintiff is unable to maintain her activities of daily living independently and will always require assistance.  (A.R. at

1334.)  The ALJ did not mention this portion of the doctor's opinion, but rather rejected his entire opinion as "conclusory" and as addressing issues reserved to the Commissioner.  (*Id.* at 21.)  As discussed above, an opinion as to Plaintiff's ability to function independently is not conclusory nor is it an opinion on the ultimate issue of whether Plaintiff is disabled.  To the contrary, this opinion only indicates that a further limitation on Plaintiff's RFC may be needed.

Finally, examining psychologist Dr. Meland-Lewis opined that Plaintiff cannot maintain tasks without support from others and recommended that Plaintiff develop job skills in a safe environment "with the support of a job coach or trainer."  (*Id.* at 1331.)  Without discussing the supportability of this opinion, the ALJ concluded that it is not persuasive because it is not consistent with evidence regarding Plaintiff's activities of daily living.  It is not clear what activities the ALJ is referring to, but elsewhere in the opinion, he noted that Plaintiff could "take cabs by herself," attend therapy appointments alone, spend time with friends, cook, do laundry, and vacuum independently.  (*Id.* at 12, 19.)  This somewhat overstates the record because Plaintiff testified that she does not prepare her own meals and other evidence suggests she has to be reminded to take her medication and relies on her mother to make appointments and calls for her.  (*See id.* at 58.) [5]

Regardless, Plaintiff's ability to perform tasks in the safe and familiar setting of her home or in therapy does not contradict a finding that Plaintiff cannot manage independently in the

---

[5]  In discussing the medical record, the ALJ also stated that Plaintiff "reported that her mother and her sister like her new boyfriend."  (A.R. at 18.)  This is a clear misreading of the therapy note in question, which states that Plaintiff's sister, Michele, reported that Michele's boyfriend met with family approval.  (*Id*. at 915.)  Plaintiff testified that she has never been in a romantic relationship and the record bears this out.  (*Id.* at 58.)  To the extent the ALJ relied on this misunderstanding of the record to make a negative credibility inference or to assume Plaintiff was more independent than she testified, this is also an error requiring remand.  *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (if the ALJ commits "factual errors" in evaluating the evidence, the decision "is not supported by substantial evidence.")

workplace.  *See Lesko v. Shalala*, 1995 WL 263995, at *5-6 (E.D.N.Y. Jan. 5, 1995) (holding

Plaintiff's ability to work in a highly supervised environment was not an appropriate measure of

his ability to work.)  While it is clear from the record that Plaintiff is actively working toward

developing her coping skills and independence through therapy, this is not sufficient to support

a finding that she is able to function in the workplace.  *See Balsamo*, 142 F.3d at 81-82

(explaining that "when a disabled person gamely chooses to endure pain in order to pursue

important goals . . . it would be a shame to hold this endurance against him in determining

benefits unless his conduct truly showed that he is capable of working.")

     Indeed, as discussed above, there is ample evidence in the record that Plaintiff cannot

function independently or without supervision at this time, including treatment notes from

Plaintiff's therapists stating that she is completely dependent on her mother for basic tasks,

lacks coping skills, did not manage at college, does not take medication without prompting, and

does not dress for the weather.  (A.R. at 809-10, 813, 817, 890-91).  The ALJ did not

meaningfully discuss this evidence in finding that Plaintiff's daily activities contradicted a

limitation for supervision in the workplace.  This amounts to impermissible cherry-picking.

*Garcia v. Kijakazi*, 2022 WL 3442314, at *21 (S.D.N.Y. Aug. 11, 2022), *report and*

*recommendation adopted sub nom. Garcia v. Comm'r of Soc. Sec.*, 2022 WL 3903182 (S.D.N.Y.

Aug. 30, 2022) (ALJ erred in failing to square plaintiff's inability to independently take public

transportation with a finding that plaintiff did not need frequent supervision for routine tasks).

     The ALJ's failure to consider these opinions was not harmless, as his RFC determination

contains no accommodation for specialized supervision or functioning independently at work.

Rather, the RFC requires only occasional interaction with supervisors, meaning the RFC assumes

Plaintiff will cope almost completely independently at work.  The VE testified that if an individual of Plaintiff's age and education required more than occasional interaction with supervisors, that person could not perform the jobs identified by the VE, and it is not clear from the record whether there are any jobs available that could accommodate an RFC with an additional restriction for enhanced supervision in the workplace.

Moreover, the ALJ appropriately found that Plaintiff's social anxiety warranted a limitation on how much interaction she could have with others in the workplace.  Plaintiff's need for enhanced supervision likely conflicts with her need for limited personal interaction. That is, while Plaintiff may need enhanced supervision due to her inability to function independently, she would not be able to tolerate such supervision due to her social anxiety. This does not mean that the need for enhanced supervision should be ignored.  To the contrary, this may simply mean that at Plaintiff's current level of functioning, she cannot work.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED and Defendant's motion for judgment on the pleadings is DENIED.  This case is remanded for reconsideration by the ALJ consistent with this opinion.

**The Clerk of the Court is respectfully directed to terminate the joint motion at ECF No. 19, enter a final judgment remanding the case, and close the case.**

**SO ORDERED.**

Dated:   February 22, 2023
        New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge